IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 19, 2015

**HARRY JOSEPH CHASE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Greene County**
**No. 13CR384    John F. Dugger, Jr.,  Judge**

—————————

**No. E2014-01375-CCA-R3-PC – Filed May 29, 2015**

—————————

The Petitioner, Harry Joseph Chase, appeals as of right from the Greene County Criminal Court's denial of his petition for post-conviction relief.  In this appeal, the Petitioner asserts that he received ineffective assistance of counsel because lead trial counsel was not present when he pled guilty, did not review the Petitioner's discovery with him, and did not fully discuss a possible self-defense claim with the Petitioner.  Following our review, we conclude that the record supports the post-conviction court's conclusion that the Petitioner received the effective assistance of counsel, and we therefore affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ. joined.

Alex A. Chestnut, Greeneville, Tennessee, for the Appellant, Harry Joseph Chase.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; C. Berkeley Bell, District Attorney General; and Cecil Clayton Mills, Jr., Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

On May 1, 2012, a Greene County grand jury returned an indictment charging the Defendant with two counts of attempted first degree murder and two counts of especially aggravated kidnapping.  The charges arose from the shooting of Chastity Morton and Brian Shackleford on August 22, 2010.  Ultimately, the trial court accepted the Petitioner's guilty pleas for two counts of criminal attempt to commit first degree murder

and sentenced the Petitioner to seventeen years as a Range I offender at thirty-percent release eligibility.

## I. Guilty Plea Submission Hearing

The trial court held a guilty plea submission hearing on September 4, 2012. At the hearing, the State did not present factual bases for the pleas; rather, the trial court accepted the facts set forth in the discovery materials, which were made part of the record. Those materials, largely in the form of police reports, revealed the following facts underlying the Petitioner's arrest.

On August 22, 2010, the Petitioner rode his motorcycle to the home of Ms. Morton and Mr. Shackleford, entered the house, and told both victims that he was going to kill them. The Petitioner refused to let the victims leave and threatened them with a gun. He then shot both victims multiple times with each victim sustaining a gunshot wound to the head. The Petitioner also suffered a gunshot wound to his left arm during the altercation.

Ms. Morton later identified the Petitioner as her assailant. On August 24, 2010, the Greeneville Police Department was notified that the Petitioner was at an attorney's office and wished to turn himself in. Shortly thereafter, he was taken into custody and received medical treatment for his gunshot wound at a local hospital.

At the guilty plea submission hearing, the Petitioner testified that he was forty-six years old and had a tenth-grade education. He testified that he was able to read and write with no difficulty. The Petitioner denied using any alcohol or drugs in the last twenty-four hours.

The Petitioner indicated that he was aware of the charges against him, as well as the potential range of punishment associated with those charges. He further indicated that he understood the elements underlying the charges and knew that the State carried the burden of proving each element beyond a reasonable doubt. The Petitioner testified that he understood that if he went to trial, the jury would be charged with lesser included offenses.

The trial court went over the rights that the Petitioner was waiving by pleading guilty, and the Petitioner indicated that he understood the rights he was guaranteed and that he was waiving those rights by pleading guilty. The Petitioner indicated that his lawyer had explained the "Waiver of Rights and Plea of Guilty" document, that he had read and understood the document, and that he had signed it. The trial court asked co-

counsel whether it was "his case" or "[lead counsel's] case."[1]  Co-counsel indicated that "[they] both worked on it."

The Petitioner thereafter agreed that he was pleading guilty because he was guilty and that he was doing so freely and voluntarily.  He denied being forced, threatened, or pressured into pleading guilty.  When asked whether his guilty pleas were the result of negotiations between his lawyers and the District Attorney General's office, he answered, "Yes."  He further agreed that he was satisfied with his lawyers and that they did everything he wanted them to do.

The trial court asked co-counsel whether he and lead counsel had "gone over the prosecution reports and discovery" with the Petitioner, and he replied, "Yes.  We have." The court asked the Petitioner whether the contents of the discovery file were a "fair statement of what the State's evidence would be against [him]," and he answered, "Yes, sir."

## II.  Post-Conviction Hearing[2]

On July 19, 2013, the Petitioner filed a timely pro se petition for post-conviction relief, alleging that his guilty pleas were unknowing and involuntary and that he received ineffective assistance of counsel.  In support of his claim that he received ineffective assistance of counsel, the Petitioner made thirty-eight allegations, apparently all against lead counsel.  Thereafter, post-conviction counsel was appointed, and an amended post-conviction petition was filed on March 25, 2014.  The amended petition adopted the issues presented in the pro se petition, although some of the specific allegations were consolidated and reworded.

A post-conviction hearing was held on May 23, 2014.  The Petitioner testified that he was initially charged with two counts of attempted first degree murder and two counts of especially aggravated kidnapping for his involvement in the August 22, 2010 shooting of Ms. Morton and Mr. Shackleford.  The Petitioner hired lead counsel after being referred to him by another attorney.  At the Petitioner's initial meeting with lead counsel, co-counsel was "sitting in the back [of lead counsel's office], like in a chair."  He testified that it was his understanding that he hired lead counsel to represent him. However, when the Petitioner pled guilty, only co-counsel was present.  He further

---

[1] Although the Petitioner asserts that he hired only one attorney, for purposes of clarity we will refer to the attorneys who worked on his case as "lead counsel" and "co-counsel."  Both attorneys worked at the same law firm, and it is undisputed that both did in fact work on the Petitioner's case.

[2] The Petitioner has apparently abandoned the bulk of his allegations against trial counsel on appeal. Accordingly, we will recount only those facts from the post-conviction hearing which are relevant to the issues presented in this appeal.

testified that prior to his guilty pleas, he had met with co-counsel on approximately two occasions, not including the initial meeting in lead counsel's office.

The Petitioner testified that he hired lead counsel because he was a "murder trial expert" and that he did not know who co-counsel was until arriving at lead counsel's office for the initial consultation. Furthermore, the Petitioner denied even knowing whether co-counsel was an attorney, saying, "I didn't know what he did. I guess he's an attorney because he's in the office."

The Petitioner alleged that lead counsel never discussed his guilty pleas with him and "didn't show up for court that day." His understanding of the guilty pleas, after discussions with co-counsel, was that he "was going to get [seventeen] years and get [thirty] percent – or get out in [thirty] percent or something. . . . But if I fought it, I'd get [thirty-four] - - probably [thirty-four] years or more." The Petitioner recalled that co-counsel went over the plea agreement with him "somewhat," but he stated that, with respect to the waiver of rights he signed, co-counsel did not go over that document with him, telling the Petitioner only that "it would be in [his] best interest to take the plea for [seventeen] years."

The Petitioner agreed that no one explained to him that lead counsel could no longer represent him or that co-counsel "would have to step in." The Petitioner denied asking co-counsel why lead counsel was not present because, on one occasion, "[co-counsel] copped an attitude because [the Petitioner] wanted to get [his] motion of discovery," but co-counsel refused to give it to him. The Petitioner clarified that he was eventually provided with a discovery file but that no one went over the contents of the file with him, and co-counsel was unable to answer his questions about the file.

The Petitioner testified that, at the guilty plea submission hearing, he was "instructed not to discuss" the fact that he had been shot during the altercation with the victims or that the victims had drugs at their house. According to the Petitioner, co-counsel also told him to "agree that he went over the motion of discovery and all of that." However, at the post-conviction hearing, the Petitioner alleged that co-counsel gave him only two days to look at the discovery.

The Petitioner opined that lead counsel was not present during his guilty pleas because "[lead counsel] was mad because he wanted [the Petitioner] to take the plea[s] and [the Petitioner] wanted to go to trial." The Petitioner alleged that he did not want to take the plea deal, but his mother's brother had just died and "she was already upset because she [had] lost her brother," so he decided to take the plea deal, "which [he] could kick [himself] in the butt for doing."

The Petitioner testified that he met with lead counsel "[p]robably about four" times, not including the initial meeting in his office. He further testified that, with respect to a plea deal, lead counsel told him, "No, we're going to go to trial." The Petitioner claimed that he paid lead counsel "$25,000 to go to trial. And if I'm going to [take a plea deal], [I would] hire a public defender or defend myself."

According to the Petitioner, after his initial consultation with lead counsel, it was his understanding that they would present a self-defense claim at trial. However, he claimed that there was never "any evidence obtained or presented to [him]" that would have supported a self-defense claim and that no one ever discussed any evidence that might be used to support such a claim, despite the fact that he sustained a gunshot wound during the victims' shooting.

On cross-examination, the Petitioner denied meeting with lead counsel more than four times. He testified that co-counsel was present in lead counsel's office at the initial consultation, but that "[he] didn't meet with [co-counsel]." However, he agreed that he was "familiar with" co-counsel "from the beginning" and that co-counsel and lead counsel visited him together at the jail after the initial meeting. He recalled the initial consultation lasting between fifteen to twenty minutes.

The Petitioner contended that he was unaware that he had been charged with aggravated kidnapping until he received his discovery file. The Petitioner testified that he had a preliminary hearing and that he was satisfied with the hearing. He acknowledged that lead counsel was able to elicit favorable testimony that supported his theory of self-defense, but he also admitted that lead counsel advised him that it would still be a difficult case.

The Petitioner recalled his guilty plea submission hearing, and when asked whether he was truthful that day, he responded, "Some I was." He alleged that he was "told to say yes to every question" or the judge might not accept his pleas. The Petitioner agreed that he "wanted to be truthful with the [c]ourt," but added, "I had to lie to take the plea[s]."[3] He elaborated, "[My attorneys] just said the judge may not accept my guilty plea if I didn't agree to all the questions and say yes to stuff that they did."

---

[3] At this point, the Petitioner's counsel requested that the post-conviction court advise the Petitioner of his Fifth Amendment right against self-incrimination. The court obliged, explaining to the Petitioner that he had a right not to incriminate himself and that he could potentially be charged with aggravated perjury if he admitted that his previous testimony was not truthful. The Petitioner indicated that he understood, but he continued to assert that he lied at the guilty plea submission hearing because his attorneys instructed him to do so.

The Petitioner testified that on August 8, 2012, he signed a statement expressing his desire to plead guilty, although he asserted that he did not want to. He admitted that he handwrote the statement "[d]own in the attorney room" and that co-counsel was present. The handwritten statement read as follows: "I, [the Petitioner], agree to accept the plea agreement offered by the District Attorney's Office which is 17 (seventeen) years at [thirty percent] RED [with] both sentences to run concurrently. I agree to accept this sentence in exchange for my [g]uilty plea[s]." However, the Petitioner further testified that he wrote the statement because he "figured [his attorneys] wasn't [sic] going to do nothing for [him] anyways" and insisted that he told co-counsel that he still wanted to go to trial.

Next, the Petitioner's father, John Chase, testified. Mr. Chase testified that he was present at the initial consultation with lead counsel and that co-counsel was also present. He recalled meeting with the attorneys for thirty minutes to one hour before lead counsel took the Petitioner in another room to speak with him privately. As best he could recall, lead counsel and the Petitioner talked in private for an additional thirty minutes to one hour. According to Mr. Chase, co-counsel was the person who called the police so that the Petitioner could turn himself in. When asked whether co-counsel was introduced to him or his son during this initial meeting, Mr. Chase answered, "I'm sure he was." Additionally, Mr. Chase testified that lead counsel interviewed him, his wife, and the Petitioner's girlfriend about the case. He remembered co-counsel being present at some of these meetings as well.

Mr. Chase testified that lead counsel took a full account of the Petitioner's version of events, including the fact that he had been shot during the altercation. According to Mr. Chase, lead counsel discussed a self-defense claim with him and expressed his opinion that the Petitioner had a "good self-defense claim." He added that lead counsel had obtained the victims' hospital reports, which showed that "they had a strange concoction of drugs in their system." However, Mr. Chase also said that "as [the case] proceeded[,] [lead counsel] thought he was doing the best by trying to make a plea agreement." According to Mr. Chase, the Petitioner repeatedly asked his attorneys for his discovery file before finally receiving the file.

Mr. Chase testified that he paid lead counsel "to go to sessions court," which he did, and that he was to pay lead counsel an additional $25,000 when the case went to criminal court. When asked what he understood co-counsel's role to be at that point, he replied, "[Co-counsel] wasn't in it." However, he added that lead counsel "got sick" and co-counsel subsequently accompanied the Petitioner to court. Mr. Chase testified that he discussed a plea agreement with both lead counsel and co-counsel. According to Mr. Chase, co-counsel represented the Petitioner at the time of the guilty pleas because "[co-counsel] didn't know where [lead counsel] was."

The Petitioner rested, and the State called lead counsel to the stand. Lead counsel testified that he had practiced law for almost forty years and that he had tried almost 200 jury trials, both civil and criminal. Lead counsel testified that another attorney referred the Petitioner to him. Thereafter, the Petitioner's mother and father came to his office and told him that the Petitioner wanted to turn himself in but was "afraid that he was going to be shot and killed" because he was the subject of an ongoing "manhunt" by local law enforcement agencies. Lead counsel suggested that the Petitioner come to his office and that he would help ensure that the Petitioner surrendered safely to the police. He estimated that he spoke with the Petitioner's parents for an hour and that after the Petitioner arrived, lead counsel spoke with him separately for an additional hour. Lead counsel testified that co-counsel helped facilitate the Petitioner's surrender to the police and accompanied the Petitioner to a local hospital where he was treated for his gunshot wound.

Lead counsel recalled that he next met with the Petitioner several days later at the jail and that they discussed developments in the case. Lead counsel testified that there was a preliminary hearing and that he was able to elicit favorable testimony for the Petitioner. In particular, one of the investigating officers testified that Ms. Morton said that she instructed Mr. Shackleford "to get the gun" during the altercation with the Petitioner and that gun had in fact been used to shoot the Petitioner. Lead counsel opined that this testimony was very helpful to the self-defense theory.

Nevertheless, lead counsel recalled that there were still problems with the case; in particular, the Petitioner had two aggravated kidnapping charges in addition to the attempted first degree murder charges. He testified that he discussed the possibility that the Petitioner's self-defense claim would be rejected and the potential for consecutive sentencing. According to lead counsel, the Petitioner gave him permission to discuss a plea offer with the State, which he did. After some negotiation, the State offered seventeen years at thirty percent, which lead counsel relayed to the Petitioner and his family. After the offer was made, lead counsel did not recall the Petitioner telling him that he wanted to take the case to trial.

According to lead counsel, he informed the Petitioner that he would not be able to attend the guilty plea submission hearing because he had a previous obligation. However, he testified that he told the Petitioner that co-counsel would accompany him to the guilty plea submission hearing. Lead counsel also testified that, at this point, the Petitioner had already signed the August 8, 2012 handwritten note indicating his desire to accept the plea offer. According to lead counsel, the Petitioner did not object to this arrangement.

On cross-examination, lead counsel testified that the Petitioner received a copy of the preliminary hearing transcript three or four days after the hearing and that he and the Petitioner discussed the testimony that would be beneficial to his self-defense claim at that time. Several months after the preliminary hearing, the Petitioner gave lead counsel permission to discuss a plea offer with the State. Lead counsel estimated that, between the time of the preliminary hearing and the Petitioner's decision to pursue a plea agreement, he visited the Petitioner in jail "dozens" of times.

With respect to the plea offer from the State, lead counsel testified that he left the decision whether to take the plea offer entirely in the hands of the Petitioner. According to lead counsel, once the Petitioner decided to take the plea offer, there was no further discussion of taking the case to trial because the Petitioner "was so happy with that option[,] that was it."

Lead counsel testified that he told the Petitioner he would be unable to attend the guilty plea submission hearing in early August. Additionally, he testified that he told the Petitioner that if the Petitioner did not feel comfortable attending the guilty plea submission hearing with only co-counsel, lead counsel would cancel his conflicting obligation. However, according to lead counsel, the Petitioner "had no problem with [co-counsel]," and "he was happy with [co-counsel]." Lead counsel characterized the Petitioner's testimony about "not even knowing who [co-counsel] was" as a "farce."

Lead counsel recalled going over discovery with the Petitioner "multitudes of times." He testified that both he and co-counsel provided the Petitioner with discovery as it became available from the District Attorney General's office. Lead counsel testified that co-counsel visited the Petitioner in jail, and he denied that the Petitioner ever objected to co-counsel's representation. According to lead counsel, the Petitioner's family spoke frequently with co-counsel on the phone about the Petitioner's case.

On June 19, 2014, the post-conviction court entered a "Memorandum Opinion and Order" denying the Petitioner relief. As is pertinent to our review, the post-conviction court found that the Petitioner failed to prove by clear and convincing evidence the factual allegations in support of his contention that lead counsel's assistance was ineffective.[4] This timely appeal followed.

---

[4] The post-conviction court also rejected the Petitioner's claim that his guilty pleas were not knowing and voluntary. However, the Petitioner has not challenged that finding on appeal; accordingly, we will not address it.

ANALYSIS

In this appeal, the Petitioner contends that he received ineffective assistance of counsel because lead counsel was not present when he entered his guilty pleas, did not review his discovery file with him, and did not discuss or follow through with a theory of self-defense. The State responds that the post-conviction court properly determined that the Petitioner received the effective assistance to counsel and is therefore not entitled to relief.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In the context of a guilty plea, the effective assistance of counsel is relevant only to the extent that it affects the voluntariness of the plea. Therefore, to satisfy the second prong of Strickland, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); see also Walton v. State, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94 (Tenn. 2009). On

appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

In its order denying the Petitioner relief, the post-conviction court specifically accredited lead counsel's testimony that he and co-counsel "talked to witnesses that were available, represented [the] Petitioner in a [p]reliminary hearing[,] and elicited favorable testimony for a possible claim of self[-]defense." The post-conviction court further found that lead counsel and co-counsel "negotiated a favorable plea agreement for the Petitioner" and "obtained the best resolution that could be had." The court found that the Petitioner was not a credible witness, in contrast to its determination that lead counsel's credibility was "e[x]cellent." The post-conviction court concluded that the Petitioner failed to prove his factual allegations by clear and convincing evidence.

Lead counsel admitted that he was not present at the Petitioner's guilty plea submission hearing but testified that he discussed his absence with the Petitioner one month before the hearing. According to lead counsel, the Petitioner knew that co-counsel would accompany him to the hearing and did not object to that arrangement. The Petitioner, Mr. Chase, and lead counsel all testified that co-counsel was involved in the Petitioner's case from the beginning. The Petitioner also signed a handwritten statement indicating that he wished to accept the plea agreement offered by the State.

Furthermore, lead counsel testified that he provided the Petitioner with discovery as it became available from the District Attorney's office. Additionally, lead counsel testified that both he and co-counsel reviewed the contents of the file with the Petitioner "multitudes of times." Although the Petitioner disputes these facts and asserts that he only had two days to review his file, the post-conviction court specifically found that the Petitioner was not a credible witness, a determination that we defer to on appeal. See Fields, 40 S.W.3d at 456.

Finally, lead counsel testified that he discussed the possibility of a self-defense claim with the Petitioner. Both Mr. Chase and the Petitioner testified likewise, although the Petitioner asserts that lead counsel did not adequately investigate or pursue a theory of self-defense. However, it is undisputed that lead counsel conducted a preliminary hearing, during which he was able to elicit favorable testimony for the Petitioner. Nevertheless, he explained his concern that the Petitioner was still facing the possibility

-10-

of conviction and was particularly concerned about the aggravated kidnapping charges. The Petitioner gave lead counsel permission to discuss a plea agreement with the State, and the Petitioner ultimately decided to accept the State's offer.

At the guilty plea submission hearing, the Petitioner indicated that he was happy with the representation he received from his attorneys and that they had done everything he asked them to do. The record supports the post-conviction court's finding that the Petitioner failed to prove the factual allegations underlying his ineffective assistance claim by clear and convincing evidence; therefore, the Petitioner is not entitled to relief.

## CONCLUSION

Based on the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____

D. KELLY THOMAS, JR., JUDGE

-11-